Next case we're going to hear, Equal Employment, United States Equal Employment v. CONSOL Energy, and Mr. Holmstrand, is that, who's going to, you're going to speak first? I am. Okay. Good morning. My name is Jeff Holmstrand, and I, along with my partner Jeff Grove, represent Consolidation Coal Company and CONSOL Energy, Inc. Revelations 13.16 says, And he shall causeth all, small and great, rich and poor, free and bond, to receive a mark on the right hand or on their foreheads. This is a case involving a biometric hand scanner. Chapter 14 and Chapter 21 refer to hands in the plural. Chapter 14 refers to hands, Chapter 21 refers to hands, but it refers to plural people. So, the case involves a bio- I hope we don't get into a religious interpretation. We certainly are not, Your Honor. I'm just setting the background for the argument that's going to follow, which is that the hand scanner that Consolidation Coal Company decided to use in order to track time and attendance would have someone place their right hand, and it would trace the shape of their hand, and then match it to a number, the employee number. Mr. Butcher, who the EEOC brought suit on behalf of, was concerned that the use of the biometric hand scanner would lead to the mark of the beast, which is referred to in Revelations Chapter 13, Verse 16. And as a result of that policy, Mr. Butcher, or the EEOC on behalf of Mr. Butcher, brought the lawsuit. There was a trial on compensatory damages, which resulted in a fining for the EEOC, and ultimately a compensatory damage award of $150,000. Subsequently, there was an evidentiary hearing to consider equitable relief, including back pay, front pay, lost pension benefits, which resulted in an additional award of $486,000 for a judgment that was entered in this case of over $580,000. This appeal has followed. There is a cross appeal. I intend, unless the Court asks questions on it, to address our principal appeal during this section, and I'll address the cross appeal as part of my rebuttal. Prior to 2012, Consolidation Coal Company used its foreman to manually track time and attendance of each of the union miners. You know, I think you don't have to justify the business benefit. It's clearly saved a lot of money. It was very efficient. The real question comes down to whether this was a genuinely held religious relief, number one, and my subsidiary question that I want to ask you is, why didn't you just let him punch the numbers in like you did the two other employees? Well, we offered him the same accommodation that we offered the two other employees, which was scandal. He said he didn't get that, and that was a disputed fact. In other words, he said they never told me I could punch the keypad. The accommodation that was offered, Your Honor, to the other employees was first they attempted to use their left hand. I understand, but they were given the keypad. Two of them were. After the left hand didn't work, Your Honor, and so in this instance, the accommodation process was the same as it had been for the other two employees. The difference is that he resigned. There is a sense in which this seems like kind of a paradigmatic reasonable accommodation violation. The employer has an accommodation. The employer is using the accommodation on people who need it for nonreligious reasons. The employer admits it doesn't cost anything. There's no burden to use this, and yet the employer denies it to one employee, the one person who wants that accommodation for a religious reason. Well, that isn't actually what the record below reflects. But it's what the jury found, more or less, right? I know that you contest some of those facts, but the jury decided them against you. Well, I don't know what the jury decided other than what's on the verdict form, and so I don't know what their rationale was. I know that the jury got to hear some things, didn't get to hear other evidence, and I want to talk about that here in a minute. But to the Court's particular point, there were three meetings that are important. The first meeting was in June of 2012, and that's when Mr. Butcher first announced that he was concerned about the use of a biometric hand scanner because it could result in the mark of the beast. The second meeting took place in early August of 2012 after basically the mine shut down. I don't think you understand his position fully. I read his whole testimony, and he explained it in some detail, and it troubles me a little bit. He does not suggest that that scanner was marking him with a sign of the beast. He was concerned about a hand identification system because a hand identification system was the method that the prophecy will use, and he did not want to subject himself to that possibility. But he recognized the system was benign as it's conceived. He said there was no mark going to be imposed. And he explained this. I mean, during cross-examination, people were trying to press him into some silly positions, and his was very well thought out from his point of view. So it seems to me we ought to leave that alone. And he said basically it applies to both hands. So at that second meeting when he rejected the left-hand offer, you guys then showed him the disciplinary forms. And he says, well, then, I'm going to resign. And if I may, Your Honor, and perhaps it wasn't clear in our briefing, however, at the second meeting, the one that I just got to referring to, he did not reject the use of the second hand at all. He said he wanted to prey on it. He said he wanted to prey on it, And at that time, he'd also been provided with a document that we had been provided by the manufacturer. What does that have to do with anything? The fact that the manufacturer thinks this will not be a religious problem for you is irrelevant if the actual person finds it to be a religious problem. Let me take this. No, no, I understand your point, but I think that we're aligning over some of the record. But your whole argument has to do with this insistence on going into this exchange as to what he did and what he accepted. In the end, he basically felt both hands were part identification. And it's not for the court or not for the company to go and look at the interpretation. The truth of the matter is I've looked at it, and I don't think it's off the wall. I mean, this is his interpretation. Your Honor, we didn't argue below, and I didn't argue in our brief. That is a burden on them, but we didn't argue in our brief that he did not have a— The point we're getting to is that after he said, I cannot use my hands, right or left, and that point came, regardless of how it led up to it, that point came. He did take time off to reflect on whether he could use his left hand, came back and said, No, I can't, under my beliefs. And so when he rejected that, then he was shown these disciplinary forms and told that you'll be fired after four or three, whatever it is. And he says, Then I have to be forced to retire. He did it under protocol. Let's take that point, then, and I'll go to that. My question, the original question, is what I wanted to get to, is it would have been so easy for the company to say, Would you be willing to punch a keypad? And he says, I would have. It's not even an implication. Well, actually, Your Honor, that isn't what he said, at least not up until trial. If you'll recall— He didn't know about the alternative. Your Honor, I'm sorry, but that's somewhat incorrect because following his resignation, and nobody disputes he quit, the question is whether he was forced to quit, and we can talk about that. The union filed a grievance as a non-employee. He was a retired employee, and we rejected the grievance because he wasn't— and it's right in the record that we rejected the grievance because he was no longer employed and wasn't covered by the grievance procedure. But there was a meeting, a hearing in connection with that grievance, during which the union representative—and this is in, I want to say, September of 2012, so shortly after this, and the union said, Why don't you just let him punch in like you do with the two guys whose hands didn't work? And he said, I don't want anything to do with that. I don't want to use the system. It was at trial when he first said, Oh, I would have done that if they'd offered it to me. But the contemporaneous testimony is different than that. Did you ever offer it to him? He said you never offered it to him. He didn't know about it. He didn't know about it until—you said— He resigned in August. Correct. At that meeting. Yes. And he said he resigned under protest. At that point in time, before he resigned, was he told that would you punch the keypad? He was not, Your Honor. Okay. At trial, if he had not resigned, and this goes to the arguments on constructive discharge, and one of the reasons that we asked for an argument in this case is because to us the importance of the collective bargaining agreement. And the reason I was going through the process is it's not as though there was no effort to accommodate him because the understanding in the undisputed testimony from the people was that they were attempting to accommodate him. When he said he wouldn't have anything to do with the system— Well, that goes to your reckless indifference question, which the EEOC has to—carries the burden on. I understand that point, Your Honor. But it also goes to the process that we went through and the state of mind of the people at the time, and it goes to whether or not he was forced to resign. There was a grievance procedure available to him. Tell me how you would characterize a meeting in which after he rejects the left-hand alternative, which is the only other alternative given for religious reasons, he's then told, well, this is a rule. You have to comply. If you don't comply three times, you're fired. And he then says, well, I suppose I have to resign. And he said in his testimony, he says, I did it under protest. But regardless of whether he said protest, isn't that constructive discharge? Your Honor— You said you're going to be fired. You know he can't accommodate it. Your Honor, if he had—if you remember the progressive disciplinary procedure, which was what he was given, the first is a warning, the second is a warning, the third is a suspension, the fourth is notice of intent to discharge. Under Article 24 of the collective bargaining agreement, the warning letters themselves would have been discipline that would have been covered by the grievance and arbitration rights. Your Honor, I don't see you're trying to get yourself relieved of a straightforward claim under Title VII because he didn't go through some collective bargaining. But the answer is, if you violate the act, you violate the act. Now, the question is, if he's told he's going to get a warning letter, a warning letter, a suspension, and discharge because he's not putting his hands under, he knows he's going to violate that within four days. He's going to get all four of those days because his conscience tells him he's not going to submit his hands to the identification system. I don't dispute that, Your Honor. All right. So now why isn't that constructive discharge? Because his options could have been to pursue the grievance and arbitration provisions that they collectively bargained for on both sides, Your Honor. If he had done that, then it would have gone ultimately to an arbitrator who would have determined whether or not there was just cause for the discipline or ultimately the termination. I submit to you that it's not intolerable, which is the requirement. Is that a defense? Is that a defense to Title VII? Failure to pursue an internal grievance procedure? Yes, Your Honor. It is absolutely a defense under Title VII because it goes to whether or not there's been and if you take a look at the cases that we cited in both our opening brief and our reply brief. Tell me what could have happened alternatively.  Sure. And you guys insisted on it and he said and showed him the disciplinary system. So then what happens, Your Honor, and this is the reason that this case is important from a collective bargaining standpoint, he would have filed a grievance under Article 24, which is the discharge and disciplinary procedure, that he would have challenged that. It would have ultimately been determined by an arbitrator if it pushed all the way through. Either there would have been an accommodation reached or not. It would have gone to an arbitrator. An arbitrator would have made a decision as to whether or not there was just cause for the discipline. If the arbitrator found there was no just cause for the discipline, it would have been expunged from his record and we would have had to have done something else. If the arbitrator found a just cause for the discipline, then we would be in front of this Court arguing about whether or not the arbitrator's decision was worthy of, should be upheld. So you understand the reasonable accommodation provision of Title VII to mean not that the employer has to provide the reasonable accommodation when it's asked for, but that, I'm trying to formulate this, that the employer has to provide a reasonable accommodation by the end of a grievance process? I would have thought that Title VII is violated when you fail to provide, intentionally fail to provide a reasonable accommodation. Thank you, Your Honor. And I don't want to go because I only have 30 seconds. I can't imagine that the point was the employer can deny it and then that's fine until the grievance procedure is completed. The point, though, Your Honor, is, and this is something even the EEOC argued, which is that there has to be a back and forth between the employer and the employee. There is a back and forth. And that, and I'm sorry to interrupt, but that also includes the grievance process. And that's in the cases that we talked about, Your Honor. The argument they made below wasn't that the grievance procedures weren't involved. They just said it doesn't matter if you have constructively discharged. And our point has been, and I haven't been able to get to this across the board, is that when you have this in process and you have people who work with the, oh, I'm sorry, I'm now over time. While we're talking about the CBA, did the CBA cover religious accommodations? I mean, was there something to grieve, did the CBA say? Well, the CBA does not specifically mention religious discrimination. There is a provision in their Article 25 that talks about various forms of discrimination. Article 24, though, is what we're talking about or what I'm talking about here, which dealt with discharge or discipline, and that includes a just cause requirement. And there's never been a suggestion that religious discrimination. So I'm sorry, because I really am having trouble following this. Tell me what is wrong about my understanding. So there's no religious discrimination provision in the CBA. He can't grieve that. You're saying he has to go through the grievance process. There's no accommodation requirement. He has to go through the grievance process and say he was unjustly terminated on what grounds? No. What I said is that a different provision doesn't mention religious discrimination one way or the other. It doesn't say it's allowed. It just doesn't mention it at all. He would come in and say I was unjustly terminated because. . . Of religious discrimination. And there's never been a suggestion that religious discrimination would constitute just cause under the collective bargaining agreement. I thought the collective bargaining agreement expressly prohibited discrimination based on greed. Well, it's. . . I'm looking at JA 1199B. Yeah, I'm too now. Yes, I'm sorry, Your Honor, it does. It does. And I have one other question for you. Thank you for correcting me on that. I must have missed this in the testimony, but you said that he expressly refused to participate in the system even if it meant just entering a number. Is that in the record? Yes, it is, Your Honor. Well, I'll find it. If you don't know, I'll mention it as soon as I get back up, but I've got it written down. Okay, good. I didn't mean to interrupt you, Judge Harris. No, no, no, I'm done. Okay, thank you. All right, Mr. Holstrom. Mr. Coburn. Is it a defense to a Title VII claim that an employee didn't go through this process, the grievance process? No, Your Honor. As the district court held, an accommodation under Title VII must be provided when the employee requests it, not when the employer is ordered to provide it by an external tribunal such as an arbitration. I just want to point out, Mr. Holmstrand referred to this grievance procedure as an internal process. That is incorrect. The grievance procedure was an adversarial proceeding in front of an arbitrator, no different than a court of law or some other tribunal. And to suggest that before a constructive discharge claim can arise, a plaintiff must exhaust some external potential remedy in a third-party tribunal before the employer is required to provide reasonable accommodation for a religious belief is not supported by any case law, and it's not supported by the statute. And they get to that issue by filing a motion to compel arbitration? In other words, they didn't file any motion to compel arbitration in this case. That's correct. That would be an alternative forum for the dispute in this case, but it's not a component of the constructive discharge or the failure to accommodate analysis, and the district court was correct to so conclude and exclude that evidence from the jury. And the district court also concluded, based on Federal Rule of Evidence 403, that there is a significant concern of jury confusion if this evidence was admitted because the jury could easily conflate Mr. Butcher's rights under the collective bargaining agreement with his rights under Title VII and the jury would be required to speculate on what some potential arbitration might have led to. And the district court was well within its discretion in excluding that evidence from the trial. Was a member of the union present at that August meeting when he resigned? There was a member of the union, a union representative present at that meeting. That's correct. But that doesn't impeach any testimony. No, I'm trying to figure out whether he thought he could have aggrieved the issue. He clearly didn't, at least from the way I read the record. It looked to me like he's a worker of some 37 years, and he said he wanted to stay on for a few more years to pay off his truck. Age 63, I think he wanted to retire. And the question is, did he recognize he had a right to grieve that issue? He testified that it didn't occur to him before submitting his resignation that he could have grieved the issue. And I would just also point out that there's a relevance showing that's lacking here because the religious discrimination was not cognizable under the collective bargaining agreement. I know, Your Honor, Judge Traxler just pointed out that it referenced creed, but this was a failure to accommodate based on a sincerely held religious belief. And as a factual matter here, the union rep did ultimately file a grievance after Mr. Butcher's resignation and then withdrew the grievance based on the finding that the collective bargaining agreement did not cover the dispute at issue here. We might be wrong about that. That's correct. But the burden was on Console to make a threshold showing of relevance with respect to this collective bargaining agreement. And the affidavit ---- It would be irrelevant unless they wanted the outcome from that procedure as opposed to a court outcome, in which case I think they would have had to file a motion to compel arbitration or have it waived. I agree with that interpretation. I think that Mr. Butcher could have arbitrated this grievance or he could have filed a lawsuit in a court of law. He chose the latter or he chose to come to the EEOC who filed it on his behalf. But those are mutually exclusive. My argument would be that Console could argue that because he didn't demand the grievance procedure, he waived it. But I don't think there's any case that I know of where if you waive your grievance procedure, you lose your rights under Title VII. That's correct. I mean, the grievance ---- if there were some agreement that he had to arbitrate any type of dispute, then that would be one thing. But here there was ---- he could have chosen either arbitration or a court of law. And at the time that he resigned, he was not aware that this type of dispute could be grieved and it didn't occur to him, and that should not factor into the analysis of whether Console placed him in a position that was intolerable. I would like to assume for purposes of the legal analysis, and I will ask your counterpart again about this, is whether to what extent is this grievance procedure a defense to Title VII claim? It seems to me what you're saying is that the employee has a right to pursue it under Title VII and can waive the grievance procedure. That's correct. Explicitly or, in this case, unwittingly. That's correct. It's ---- there is no defense based on this external collective bargaining agreement or this external forum such as an arbitration that ties ---- But my understanding is that Console was arguing not that it's a defense to the Title VII action, but the question is whether or not he was constructively discharged, whether or not he was forced into leaving the company. And their argument is that he had this grievance procedure available to him that might have eliminated that necessity. Right. But again, the constructive ---- the elements of a constructive discharge claim came together and were complete before the grievance even would have taken effect. So to determine whether a constructive discharge occurred here has no bearing on what the grievance procedures were or what was available to the collective bargaining agreement. And the Title VII analysis is distinct from the labor law, you know, contractual rights that would have had to have been interpreted if the collective bargaining agreement was admitted into evidence. So the district court had various grounds to exclude that evidence from the jury and was correct in doing so. In no way was this an abuse of discretion. Apparently it was a very hard decision for him because didn't his trial start off with all this evidence and argument coming in, and then he ruled after the first day? Am I remembering that correctly? You're remembering that correctly. What happened is the EEOC filed a motion in Lemonnet to seek exclusion of the evidence. The court ---- the district court said in the pretrial conference that he would defer ruling after hearing some testimony on it. And then in the morning of the second day of trial, the court ruled that the district court should give a curative instruction to the jury to ignore that evidence. He assigned no blame to either party for admitting the evidence, and the jury is presumed to have followed that curative instruction. There's no reason to believe it did not. So that course of action was not an abuse of discretion. And I'd just like to talk about the jury instructions here. There was no prejudice based on the precise wording that the court chose for the jury instructions. The standard for jury instructions is that it must adequately inform the jury of the governing legal principles and not unduly confuse the jury. There's no reason to believe that that ---- that there was prejudice or undue confusion here. In terms of the amount for compensatory damages, Consall argues that that was excessive or against the weight of the evidence. That is not correct because there was testimony here from Mrs. Butcher, who is Mr. Butcher lost 30 to 35 pounds as a result of the loss of his job, that he ---- she found him withdrawn, sitting alone, and that he reported that he felt depressed, so much so that his grandson asked what was wrong with him. Mr. Butcher himself testified to the anger and desperation that he felt after losing his job, as well as the sadness over the loss of the relationships that he had developed over the course of his 37-year career. So the jury had ample support for its finding of compensatory damages. And the district court did not err in giving the supplemental instruction on compensatory damages. What happened there was the jury returned an initial verdict, and under the category of compensatory damages, it wrote salary plus bonus, pension, and court costs, which was at odds with the instructions that the jury had received as to what constitutes compensatory damages. So the court recognized the confusion and re-instructed the jury on compensatory damages and told it to continue deliberating. In so doing, the district court said, the fact that I am sending you back does not indicate my feeling as to the amount of damages or whether compensatory damages should be awarded at all. And when the jury did come back with an award of compensatory damages, the court took a poll of the jury at Consall's request to ensure that none of the amount was for salary, bonus, pension, and court costs. This was not an abuse of discretion. This was wholly consistent with what this court recently approved of in the Jones v. South Peak Interactive case. Your Honor, Judge Traxler was on the panel there. In that case, the district court did a very similar thing, and this court called it, quote, the sensible thing to do. So Consall tries to assign error based on this course of action by the district court, and it is meritless. I'd like to talk about the back pay and front pay issues and the mitigation findings. Consall has the burden, well, let me just say this. Full back pay is presumed unless Consall carries its burden of persuasion that Mr. Buescher failed to reasonably mitigate his damages. The district court had an evidentiary hearing on this, heard testimony from the parties as well as experts, found that immediately after the constructive discharge, Mr. Buescher explored various avenues to find replacement work. He applied for and interviewed with another coal mining company but was not selected for the job. He went to job fairs. He looked at Help Wanted signs. He listened to radio advertisements looking for other jobs, and he, after three or four months of searching, took a lower paying job in the construction industry. Now, this was not only reasonable given the life circumstances of Mr. Buescher at the time, that he had a family to support and bills to pay, but under this court's decision in Brady v. Thurston Motors, he had a duty to accept inferior work, including lower paying work, because if he had not accepted that lower paying job, there's no telling when or whether he ever would have mitigated at all. And if he had not taken that lower paying job, I submit that we would be here before you and Consall would be arguing that he should have taken that lower paying job because otherwise it would be liable for the full amount of back pay, absent any interim earnings. So this was not only reasonable, it was required, and the district court was correct to find that Mr. Buescher reasonably mitigated his damages. And with regard to the court's finding on the collateral source rule, that was also correct, and there's no reason to reduce the back pay or front pay awards based on the pension benefits that Mr. Buescher received. This court's standard is clear from Slowus v. CSX Transportation. I wanted to ask you a question. Oh, sure. I'm sorry. But you may be getting ready to answer it. It seems to be some confusion in our cases as to how this collateral source rule works. So which case do you want us to go by? Well, I think Slowus v. CSX Transportation sets forth a broad principle, which is a benefit is from a collateral source unless it derives from a payment set up by the employer to the employer. So it's the function of the funds or the source that is at issue. And unless the funds are set up to indemnify the employer for liability, it is from a collateral source and should not even be considered when assessing damages. So, and that, although that was not an employment discrimination case, that principle has been applied by this court more recently in an employment discrimination case. The case is called Highland v. Xerox Corporation. So that is the standard that EEOC submits should be followed. So what do you want us to do with the other case? Is it Ferris? Well, Slowus itself does distinguish itself from Ferris. Ferris talked about if a benefit is directly, exclusively from the employer directly to the employee. And that's in footnote 10 of the Slowus. Well, this was a commingled, sorry. No, no, sorry. This was a commingled fund among various employers that were all part of this collective bargaining agreement. So in that sense, the facts here are more similar to Slowus than to Ferris. But I agree that. Did you enter damages at all? I'm sorry? Are you going to address your claim? Yes. Thank you, Your Honor. We only have a couple minutes on that. Right. Thank you, Your Honor. So I would just like to say the district court here really was exceptional in rendering a host of rulings that were in keeping with the decisions of this court and of the Supreme Court. But as we pointed out in our brief, there was one error made by the district court, and that was midway through the trial when it ruled that the evidence that had been presented up to that point in the trial could not support a punitive damages claim. This was incorrect because, first of all, the standard for granting a motion under Rule 50A at that point in the trial is that the evidence must be so clear. And there was ample evidence just from the EEOC's case-in-chief that would support a finding of punitive damages. Specifically, it was undisputed that all of the managerial officials for Consol were well aware of the requirement that accommodations be provided for religious... I understand. But, you know, your standard and your arguments suggest anybody who knows the law is going to have punitive damages. And the statute says two words, malice or reckless indifference. And the question is, was Consol indifferent to the law? And I respectfully suggest that they spent quite a bit of time trying to work this out. They may have done it wrong, and the jury so found. But to say they were recklessly indifferent, I'm not even sure they were indifferent at all. They recognized the law. They recognized the obligations. They did some research. They looked up the religious thing. They concluded he had some grounds for it. And they were imperfect in how they handled it, but they weren't indifferent such that you'd meet that standard. I have three responses to that. First of all, the case of EEOC v. Federal Express Corp. says that if a managerial official of a company has even a rudimentary knowledge of the legal requirement, that a jury could find reckless indifference to a perceived risk. Clearly, but rudimentary, that would make every executive, every company liable because I can tell you today, every major corporation knows you can't discriminate based on religion. So all of a sudden, we automatically under this position have punitive damages. I take your point. And what the statute says is that is the foundation for indifference. In other words, you have to know of the statute and then be indifferent to it. And there are two pieces of evidence in this case that support a finding of indifference. One is what Judge Harris pointed out. There was a cost-free, readily available, reasonable accommodation that Consol was offering to other employees at the very time that it was concealing from Mr. Butcher. So that shows some sort of mens rea to be actively concealing something, an alternative that they're offering to somebody else. I don't believe that they had this clear alternative, and I'm not sure it's fully explored. But he did say, I don't want anything to do with that system. And he said it earlier on. And the question is, how do you construe that? I would have thought that they would come forward and say, well, we have two guys using this pad. Would you be able to do that? They didn't do that. But does that show reckless indifference? It didn't cross their mind. They have a man who's saying, I don't want anything to do with the system, not fully understanding his position, and did a little of their own research. But they were aware of the law, and they were not indifferent to it. They tried to handle it. Well, they tried to convince him to scan his left hand, which was at odds with his interpretation of the Book of Revelation. How is that an effort to accommodate? How is that indifference? Well, because the opposite. It's attention. They had a protocol in place, which came in through the testimony of Tom Hudson, that under no circumstances would they provide an accommodation to the hand scanner policy for religious beliefs. My red light is on. May I just finish the point? Yes. Thank you. So Mr. Hudson testified that they had a protocol that said only physical impediments to the hand scanner would allow for any type of accommodation to the hand scanner. So that shows that despite knowing about the legal requirement, they — If that were so, they wouldn't have gone through all the steps. They went to the manufacturer. They looked up the revelation. They recognized that the portion that described it centrally in Chapter 13 referred to the right hand. So they came back with the left hand. And with respect to the other two, the left hand didn't work, so they had to do it. But they wanted to stay within the system. It was an efficiency device that saved them a lot of money in running their minds. I understand that. And I would just argue that a jury could find that all those efforts were nothing more than to convince him to scan his left hand, not to provide an accommodation, despite knowing that an accommodation was required. Actually, can I ask this? It may be sort of the same question, but in a slightly different way. What if they were — and I think this is a plausible reading of the record and what Judge Niemeyer was talking about. What if — it does seem to me they spent a lot of time delving into the justification for this man's religious beliefs, right? They introduced the evidence from the machine maker saying, we do not impose the mark of the beast. They couldn't — I think they sought and could not get a letter from his clergy person saying that he was right about his religious beliefs. Even in their appellate briefs, there's some, at least, allusions to the fact that that's not how we read scripture. So what if what is going on is that they basically understand the religious accommodation provision, but they think this guy doesn't need a religious accommodation because he's wrong. There is no mark of the beast being imposed by this machine. That would be wrong as a matter of law. They would have misunderstood Title VII, if that's what they think. But would they — is that the kind of malice that can be punished with punitive damages? If they had a mistaken but good faith belief that Title VII doesn't require them to accommodate him because he's wrong about the scripture. Well, I mean, that sort of goes back to the sincerity of his religious belief. So they think he's sincere. They just think he's wrong. I think that the punitive damages analysis and reckless indifference to the law has to be — has to focus on what the individual — the plaintiff's individual personal religious belief is, because I think otherwise it requires employers to get into theological arguments. It really does. But I guess maybe I'm asking the question wrong. What if I agree with you on the law under Title VII, none of this is relevant, whether his clergy person agreed with him, whether — who has the best reading of scripture? These are his beliefs. They need to be accommodated if there is a reasonable accommodation, which there clearly was here. But what if — but what if the employees in question, employer in question, still didn't subjectively understand that about Title VII? I think a jury could find that based on the evidence that had been presented in the EEOC's case in chief. But it's not required to find that, and that's why the district court erred. That's exactly how they could. But it seems to me if the employer said, this guy's a quack and we're not going to listen to him anymore, he can either submit or be fired. To me, that's punitive damages. But here, they didn't do that at all. They tried to understand. They tried to accommodate. They did it imperfectly. They had several meetings. They allowed him to go back and say he wanted to pray on it and come back. And they ultimately rejected it, erroneously. Is that indifference? Indifference means you don't pay attention to the law. Mr. Butcher testified that he had an objection to scanning either hand. I understand, but where's the company's indifference? The company was indifferent to that because it continually tried to force him to scan his left hand, even though that was just as much a violation of his religious faith as scanning his right hand. Except they weren't indifferent to it. They explored it. They explored it and found erroneously. But they went and read the scripture and it says right hand in Chapter 13. And they looked at that and then they went to the manufacturer. And then they asked him about his left hand. I mean, give me a break. The word indifference means not paying attention to the statute when you know it's there. And my question is it's not reckless indifference. There's no indifference at all. They were giving attention to the responsibility. They just did it wrong. But if you credit Mr. Hudson's testimony. At least according to the jury. Right. And if you credit Mr. Hudson's testimony, which the jury was entitled to do, he said that there was no situation in which a religious accommodation would be provided. That supports a finding of indifference. That doesn't play out. Because they had these several meetings. They had these accommodation offers. They went to the manufacturer. They read the scripture. They wanted to get this pastor letter. They looked into it. And they recognized they have a responsibility. And they drew a line at some point where they thought the employee was unreasonable. I understand your Honor's point. I just want to point out the letter from the manufacturer was already on file. They didn't go seek that out. But that's just a factual correction. Why was it on file? Apparently this had come up before. And the manufacturer provided a letter to its clients to let them know that this is what you say if someone raises an objection based on the mark of the beast. That was 12 years before the events of this case arose. So they had to go dig it out somewhere? That's presumptively true. I don't know exactly what process they went to to get the letter. A 12-year-old letter. They had it on file. I understand your position. Let's hear from Mr. Hudson. Thank you. I testified in front of the Federal Rules Committee a few weeks ago. I got more questions today than I did the whole time I was there. Who's the chairman of that committee? The chairman of that committee. Actually, Ed Cooper is the reporter for that committee who I had in law school. And the judge who was asking. Campbell? Yeah, I think that's exactly who it was. It was very interesting. In any event, I indicated I would point you to the page in the Joint Appendix. It's 954 to 955 is the testimony related to what he said at the subsequent grievance hearing with respect to not wanting to punch a number into the system. I was asked about the reasonable, whether or not the grievance procedure related to the constructive discharge question. It seems like in our constructive discharge cases, what we're asking is, is the workplace discrimination so bad that this person is entitled to leave rather than staying to litigate? Well, actually, Your Honor, and I'll go to that, because the cases I'm talking about talk about the use of grievance procedures as part of that. How intolerable is it if you've got a grievance procedure available? How intolerable is it if you can go to court and litigate that way? I don't understand what the difference would be. They're both sort of outside the procedure. Well, but that's an interesting point that counsel for EEOC brought up, which said this isn't an internal grievance procedure. But that isn't exactly correct. If you take a look at the procedure, it starts internally. Let me ask you. Let me just ask you. Why should we treat, since the thrust of the question is, are the conditions so bad that you can leave rather than staying while litigating, why should we treat staying while grieving differently than we treat staying while litigating? Do you see what I'm saying? I do see the – I understand what you are saying. I don't think that that's exactly pertinent to this particular issue because it starts with internal processes. Meet with the mine superintendent and go forward. I get that you don't see that my question is pertinent, but if you could just try to help me. No, no. In this I'm trying to explain – I'm sorry. I'm trying to explain why I – what I think the distinction is between saying you can quit and then litigate as opposed to – the idea is are your – the reason that we don't require – the reason that we don't require that a disciplinary action be taken in the first instance because otherwise under Firestone that's a requirement. There has to be a sincerely held religious belief that conflicts with an employment requirement. The employee has to inform of that religious belief. And then the third step is there either has to be – there has to be some form of discipline. And what these cases – what the cases have subsequently said, at least as I read them, is we won't require that the discipline happen. We won't require that the employee actually undergo discipline. If the working conditions are so intolerable that any reasonable person would feel that they could – that they were fired, that they could leave. And what I'm saying, Your Honor, is that where there is a grievance procedure in place that is an alternative in every circumstance to having to leave, you could say I don't want this. I can grieve this right now. And if you – You can't just go right to court and file a court case. I just – Well, Your Honor – Are you saying that a grievance proceeding is different because it's sort of more streamlined? You'll get relief faster? Well, I'm saying that in part and I'm also saying because it's – The point of constructive discharge law is that we don't make people stay while they seek redress for the injury. And I don't understand why seeking redress through a grievance procedure ought to be an exception to that general rule. Well, certainly the cases that we cited say that that is a part of it because that determines whether or not the conditions were so intolerable that they were forced to leave. Because if the choice is quit or be fired, if he'd been fired, then he would have – Sort of. Scanned or be fired. I didn't put it up to him. I mean, he said I can't use my left hand. And they then took the subject and said, well, you're going to have to do it. You're going to have to comply with the system. And then went through the disciplinary procedure. And he's now facing a disciplinary procedure for something that he thought was justified. Sure. And he wasn't disputing that they were going to – they rejected his. And they weren't disputing that he was going to hold on to his position. Your Honor, to the point that you raised in the EEOC arguments about that it was, I think you said imperfect, not indifferent. And another time you said just they didn't fully understand his position. The grievance process would have allowed those things to continue to the point where perhaps he wouldn't be here at all. And that's the reason why. My questioning of your counterpart is basically to explore the relationship between the grievance procedure and the Title VII. But I think based on just preliminary stuff, it seems that Title VII stands on its own and doesn't have the requirement of going to arbitration. Even if there's an arbitration clause, if the person wants to waive it. Now, I suppose you or he could have pursued the arbitration posture. And you may have come out with a different outcome. But I don't know how you read that into Title VII. He could file Title VII even while he's still there if there was an adverse employment decision. I was asked earlier, and may I? I don't know if I'm permitted to respond. I was asked earlier whether religious discrimination was included in the Title VII provisions of the collective bargaining agreement. And I was pointed out that creed is mentioned in there. I know that there's – but the point about this is, Your Honor, the reason we have a collective bargaining agreement that has these provisions in it is to avoid this. Raise this below. I mean, the collective bargaining agreement could have been asserted. I think you could have – I don't know how you would have raised it. I haven't prosecuted those myself. But I would think you would move to compel arbitration. Well, I can't speak to what was done at that stage, Your Honor. But in any event, obviously there's a lot of other issues. Thank you very much. Mr. Colvin, you have a little rebuttal on the punitive damage issue, I think. That's what we have to limit you to, right? I can't respond to the constructive discharge slash grievance procedure. Well, go ahead. I really have nothing left to say on punitive damage. His rebuttal was to you, and you're now getting the last word on his rebuttal. But go ahead. I really only have one point to make. The cases that can solve cites with regard to what it refers to as internal grievances, I think one of the sources of confusion here is the word grievance is used in two different – for two different meanings. What those cases talk about is that before an employee must resign, they have to go within the company to the highest levels to complain, and that's for purposes of giving notice to the employer and allowing the employer an opportunity to correct the situation or at least try to correct the situation. Here, Mr. Butcher went to the highest levels of Console's human resources department. Sam Johnson was the director of human resources. He was the one who concluded that Mr. Butcher would have to stand his left hand or face discipline. There was nowhere left to turn, and to conflate a collective bargaining agreement grievance process, which is an adversarial process, with the cases that talk about going up to the highest levels within the employer for purposes of giving notice and correcting the situation is just an inapposite comparison. So that's what those cases stand for. That's correct. Okay. Thank you. Thank you, Your Honors. We'll come down, Greek Counsel, and then proceed on to the final case.
judges: Paul V. Niemeyer, William B. Traxler, Jr., Pamela A. Harris